Justin E. Klein (jek@robinsonbrog.com)
Nicholas M. Menasché (nmm@robinsonbrog.com)
ROBINSON BROG LEINWAND GREENE
GENOVESE & GLUCK P.C.
875 Third Avenue, 9th Floor
New York, New York 10022
(212) 603-0488
*Attorneys for Plaintiff Suite, LLC*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SUITE, LLC,<br><br>                              Plaintiff,<br><br>           -against-<br><br>CURRENEX, INC., STATE STREET CORPORATION, STATE STREET GLOBAL MARKETS LLC, FROST & FIRE LTD.,<br><br>                              Defendants. | Civil Action No.:  -CV-<br><br>**COMPLAINT** |

Plaintiff, Suite, LLC ("Suite"), by its attorneys, Robinson Brog Leinwand Greene Genovese & Gluck P.C., alleges as and for its complaint against defendants Currenex, Inc. ("Currenex"), State Street Corporation and its wholly-owned subsidiary State Street Global Markets LLC (collectively, with State Street Corporation, "State Street") and Frost & Fire Ltd. ("Frost") (collectively, Currenex, State Street Corporation, State Street Global Markets LLC and Frost are "Defendants" and each are individually a "Defendant") as follows:

## NATURE OF THE ACTION

1.      This action arises from Defendants' (1) willful, brazen, calculated and concerted effort to infringe upon and misappropriate Suite's intellectual property, including its source-code; and (2) subsequent efforts to conceal their actions and stonewall Suite's attempts to uncover the scope of their wrongdoing.

2.        Despite its previous unsuccessful efforts to investigate Defendants' actions, Suite recently became aware of the extent and scope of Defendants' wrongdoing because of a separate litigation filed in this Court, <u>TradingScreen Inc. v. State Street Global Markets LLC</u>, No. 16-cv-01853-AJN (2016) (the "TS Action").   A copy of the Amended Complaint in the TS Action ("Am. Compl.") is appended hereto as Exhibit ("Ex.") A.

3.        The allegations in the TS Action confirm what Suite suspected, <u>i.e.</u>, Currenex and State Street have breached the confidentiality provision and restrictions in a September 2011 licensing agreement between Suite and Currenex (the "Agreement"), infringed Suite's registered copyrights in its software and source-code and misappropriated Suite's trade secrets by, <u>inter alia</u>, distributing Suite's copyrighted, confidential software and source-code to third parties (including an existing customer of Suite, "TradingScreen," and a competitor of Suite, Frost) without the consent or authorization of Suite.   A copy of the Agreement is annexed hereto as Ex. B.

4.        State Street and Currenex made a significant effort to carry out and conceal their infringement and misappropriation of Suite's intellectual property.   Indeed, Bleron Baraliu ("Bleron"), the individual at Currenex and State Street who was involved in negotiating the Agreement, abruptly terminated the Agreement one year after it was executed and then, shortly thereafter, left to run Frost, a competitor to Suite that he founded while working for State Street. Frost then improperly used and distributed Suite's copyrights and created derivative works from Suite's copyrighted source-code and software for use in its competitive risk management business.

5.        Specifically, Frost distributed Suite's copyrighted source-code and software (that was licensed to State Street) directly to Suite's customer, TradingScreen.   In addition, upon

information and belief, Frost took Suite's source-code and used it to create a derivative work that Frost now markets and distributes to the public.  Thus, Frost is liable for copyright infringement, misappropriation of Suite's trade secrets and unjust enrichment.

6.      Currenex and State Street not only directly infringed Suite's intellectual property by exceeding the scope of the Agreement, but they also contributed to Frost's wholesale infringement of Suite's intellectual property because, as part of the agreement between TradingScreen and State Street, State Street required TradingScreen to pay Frost $400,000 for purported "services" while the real purpose of the payment was so that Frost would provide Suite's source-code and software to TradingScreen.  Thus, State Street is also liable for contributory and vicarious infringement because it allowed Bleron to abscond with Suite's source-code to use at Suite's competitor, Frost, and facilitated Frost's commercial use of it.

7.      As set forth more fully below, Defendants' behavior is egregious.  Defendants deliberately misled and deceived Suite, evidently believing that their size and resources allow them to operate with impunity.

8.      Accordingly, Suite brings this complaint to:  (1) permanently enjoin Defendants' continuing copyright infringement and misappropriation of Suite's trade secrets; and (2) recover its damages arising from Defendants' intentional bad acts as well as punitive damages to punish defendants for their impertinence and to deter future conduct by others.

## JURISDICTION AND VENUE

9.      This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1338(a) because the claim arises under the Copyright Act of 1976, 17 U.S.C. §§ 101, et. seq.  This Court has supplemental jurisdiction over the breach of contract and other common law claims pursuant to 28 U.S.C. § 1367(a) because these claims are so related to the copyright

claims that they form part of the same case or controversy, i.e., the claims arise from the same nucleus of operative facts, under Article III of the United States Constitution.

10.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(a) and (b) because Defendants conduct substantial business within the State of New York, they have infringed Suite's copyrights within the State of New York and a substantial part of the events or omissions giving rise to Suite's claims occurred in the State of New York.

**PARTIES**

11.     Suite is a New York limited liability company with its principal place of business at 60 East 42nd Street, New York, New York 10165.

12.     Upon information and belief, Currenex is a Delaware limited liability company with its principal place of business at 1230 Avenue of the Americas, 18th Floor, New York, New York 10020.

13.     Upon information and belief, State Street Corporation is a Massachusetts corporation with its principal place of business at One Lincoln Street, Boston, Massachusetts 02111.

14.     Upon information and belief, State Street Global Markets LLC is a Delaware corporation with its principal place of business at 1230 Avenue of the Americas, New York, New York 10020.

15.     Upon information and belief, Frost is a Luxembourg Ltd. with its principal place of business at 3 Columbus Circle, New York, New York, 10019.

**FACTUAL BACKGROUND**

**I.      Suite's ALib Software**

16.     Suite is a vendor of quantitative financial analytic software used by financial institutions to compute market values and analyze market risk inherent in financial derivatives

transactions and portfolios.  Established in 2001, Suite's global customer base includes top-tier banks, data-providers, ECN's/online trading platforms, outsourced service providers, hedge funds, and small community banks.  Suite also provides customized software implementations, independent valuation services and portfolio stress testing.

17.    Suite's primary analytic software, ALib Analytic Library ("ALib"), is used for pre-execution pricing, risk management and valuations on bonds, interest-rate swaps and related rates derivatives products, including options and credit derivatives.

18.    ALib is comprised of approximately 595 financial analytic functions (the "Functions").  The Functions provide the business intelligence needed by financial institutions to project values of financial instruments which derive their value from observed market rates and prices of instruments with similar characteristics and sensitivity profiles.

19.    The Functions range from very simple algorithms (such as date routines and interpolation routines) to cash-flow generation, financial math and complex matrix and polynomial functions as well as trinomial-tree routines that value swap options.  Underpinning the library are over 1,000 underlying analytic sub-routines written and maintained in the C and C++ programming language.  A powerful code-generation utility is maintained by Suite which compiles the underlying analytics into program interfaces (API's) such as Java, C-Sharp, C++, Python, VB, MATLAB and EXCEL add-ins.  ALib is supported on a range of operating systems, including Windows, Linux, Solaris and MAC.

20.    Suite continues to maintain, enhance, and develop modifications to ALib as customer requirements and market conventions evolve.  Suite has quantitative analysts and developers coding and maintaining the ALib routinely.  Suite employs a unique building-block

design along with rigid coding and documentation standards to ensure continued enrichment of the toolset.

21.     ALib is fundamental to Suite's business – indeed, it is the core product that Suite offers to the financial market.  Suite expends significant money and effort to develop and maintain ALib and that software could not easily be duplicated or recreated.  Suite also takes significant steps to protect the security and maintain the secrecy of ALib and the source-code.

22.     Specifically, Suite protects its intellectual property, including ALib and the ALib source-code (human readable code consisting of a list of text commands to be compiled or assembled into an executable computer program) (the "Source-Code"), from unauthorized usage by compiling in one of several security features, which include delivery of one or more "license key files" that will prevent the software from operating if certain conditions (defined within the license key) are not satisfied.

23.     The different types of security mechanisms are as follows:

> Time-Secure: Typically used for organizations that have licensed ALib for an unlimited number of installations, the time-secure license key will enable operation on any computer, but only until the expiration date defined within the license key. Time-Secure license keys are sometimes referred to as "sunset" keys;

> Machine-Secure:  For organizations that license ALib based on the number of computers (either desktop machines or servers), the Machine-Secure license key file contains certain credentials that are unique to each computer.  In order to produce the license key, Suite requires that the customer supply both the "Volume Serial Number" of the hard drive and the "MAC address" aka "Ethernet Adapter Physical Address."   The Machine-Secure security mechanism also includes delivery of a second license key file, (a time-key as described above), such that ALib will only operate if the machine credentials (volume serial number and MAC address) are satisfied AND the date is on or before the date indicated in the time-key;

Server-Secure: A third protection mechanism termed server-secure is similar in all respects to the machine-secure type, however the machine credentials and time-out date are all contained within one license key file.  This is the most commonly used type of ALib security.   Some organizations that license ALib have separate groups of users, or license-fee rates that depend on the type of licensed ALib interfaces (Excel, Java, C#, etc..), and in those cases the organization may be using two or more security mechanisms.

## II.   Suite's Copyright Registration

24.   ALib is computer program that is an original work of authorship fixed in a tangible medium of expression and is subject to copyright protection.  17 U.S.C. §§102(a), 101. The source-code and object code underpinning ALib, i.e. the literal elements of ALib, are also protected expression under the Copyright Act.

25.   Suite owns the copyrights for ALib and the Source-Code, and registered these copyrights with the United States Copyright Office in 2014, assigned registration number TXu001910058, record of which is attached hereto as Ex. C.

## III.   Currenex/State Street License ALib

A.   The Agreement

26.   State Street and Currenex contacted Suite in late August of 2011, stating that they had an urgent need for financial analytic software.  Upon information and belief, State Street and Currenex's urgent need for ALib was driven by State Street's interest in becoming a clearing member at the Chicago Mercantile Exchange ("CME").  In order to become a clearing member, State Street and Currenex needed to prove to the CME that they possessed the necessary analytic capabilities to manage financial market risks associated with being a Futures Commission Merchant ("FCM").  Upon information and belief, State Street and Currenex were able to demonstrate that they had the proper capabilities of an FCM by providing a demonstration of

ALib to CME.  Upon information and belief, the demonstration of ALib to the CME is what caused CME to approve State Street and Currenex's application to become a Clearing Member.

27.     During the course of negotiating the Agreement, Currenex and State Street stated that they needed to modify the Source-Code in order to enhance the analytic functionality under State Street's internal risk management requirements related to their business.  Given that the Source-Code is the underpinning of the computer program, the Source-Code is highly confidential and very sensitive information.

28.     Thereafter, Suite required State Street to enter into the Agreement for a license to use, inter alia, a subset of the Source-Code (the "Copyrighted Work").

29.     The Agreement provided State Street and Currenex with a perpetual license of the Copyrighted Work, but that license was limited to State Street's and Currenex's use and precluded resale or sharing with third parties:

> Licensee shall use the Software Components solely for Licensee's normal and customary business purposes . . . except that Licensee may embed such Software Components within Licensee's systems that may be made available to customers of Licensee, provided that Licensee does not resell or otherwise make available to any third-parties direct access to the analytic library functions (program interfaces) in a way that competes with Suite's licensing to other parties of direct access to Suite's ALib analytic library functions (program interfaces). Suite retains all proprietary rights, title and interest in and to the Software Components including all applicable rights, patents, copyrights, trademarks, trade names and documentation and all other intellectual property rights to the Software Components.

See Agreement § 4 (emphasis added), annexed hereto as Ex. B.

30.     In addition, the Agreement provided that the Copyrighted Work is Confidential Information belonging to Suite:

> In addition, Licensee acknowledges that the Software Components contains, in part, and constitutes in its entirety as the Confidential

Information of Suite (as hereinafter defined). As to Suite the term "Confidential Information" shall mean any Software Components source code, executable code, object code, tables, know-how, trade secrets, ideas, inventions, layouts, procedures, processes, and techniques.

31.     Further, section 4 of the Agreement further limited State Street's and Currenex's use of the Copyrighted Work, barring any form of distribution, reproduction, or sale of it to others:

> Licensee shall not sell, license, time share, transfer, publish, copy, disclose, modify, translate, decompile, reverse engineer or otherwise make available any portion of the Software Components to any third party except as expressly provided herein and Licensee shall hold the Software Components in strict ' confidence. Licensee explicitly agrees to use commercially reasonable efforts to prevent unauthorized access to, and use of, the Software Components. In addition to any other right Suite has at law or equity, Suite shall at all times retain full right, title and interest to the Software Components and all intellectual property rights related thereto.

See Agreement § 4 (emphasis added), annexed hereto as Ex. B.

32.     The Agreement included a provision for Suite to provide annual maintenance of the Copyrighted Work to State Street and Currenex for a fee. In or around July 2012, Suite emailed Bleron, who at that time was working for State Street and Currenex, to inquire whether State Street intended to continue with annual maintenance of the Copyrighted Work. Bleron responded that State Street and Currenex were no longer using the Copyrighted Work and that the project was cancelled, "sort of."

**B.   State Street seeks Permission to License Suite's Intellectual Property to TradingScreen**

33.     In 2014, approximately two years after Bleron claimed that State Street and Currenex were no longer using the Copyrighted Work, State Street and Currenex requested a meeting with Suite. At the meeting, State Street and Currenex asked Suite to waive the

confidentiality and other use restrictions in the Agreement and for permission to deliver the Copyrighted Work to TradingScreen, an existing customer of Suite, as part of a business arrangement between State Street and TradingScreen.

34.    Suite had previously licensed ALib to TradingScreen, an online bond trading platform, in April of 2010.

35.    During Suite's discussion with State Street and Currenex regarding its proposed agreement with TradingScreen, State Street specifically assured Suite that TradingScreen would have no right to deliver or provide the Copyrighted Work or any portion thereof to its customers. Specifically, in an email, Nachiketa Das of State Street stated that "[t]he risk management product is planned to be hosted on Trading Screen's servers and deployed to State Street for State Street's use. Trading Screen is not authorized to use those routines – ours as well as ALib's pricing functions – for any other customer."

C.    >State Street Unilaterally Asserts its Right to Distribute Suite's Intellectual Property to TradingScreen

36.    In order to assess State Street's and Currenex's request, Suite asked State Street and Currenex for information regarding the nature of the proposed use and logistics between State Street/Currenex and Trading Screen, including information concerning confidentiality and software-access restrictions.  State Street and Currenex repeatedly ignored Suite's request for this information.

37.    Ultimately, State Street abruptly discontinued its conversation with Suite concerning amending the Agreement.  In an email to Suite, Nachiketa Das of State Street stated that "[w]e spoke with our attorney and we affirm that our current use of the product is within the license scope of the agreement, and no amendment or changes to the agreement are required."

38.     Thereafter, in response to Nachiketa Das' email, Suite attempted to determine from State Street and Currenex what intellectual property they intended to provide (or already had provided) to TradingScreen.  These attempts were either ignored or met with constantly-shifting explanations that were not credible.  In fact, State Street's in-house counsel, Anne T Chou-Leung, misrepresented that the Copyrighted Work had not left State Street's premises.

39.     Thwarted in its attempts to gather further information concerning State Street's and Currenex's actions concerning State Street's proposed reproduction and distribution of the Copyrighted Work – and its intended use or distribution of the Copyrighted Work to TradingScreen – Suite contacted TradingScreen to find out what intellectual property State Street had provided to TradingScreen.  TradingScreen would not cooperate with Suite's request as it claimed it was bound by confidentiality clauses in an agreement TradingScreen entered into with State Street (the "TS/SS Agreement").

40.     Instead, TradingScreen advised Suite to write a letter to TradingScreen requesting information relating to the TS/SS Agreement (the "TS Letter") and TradingScreen would send the request to State Street.  Suite prepared and sent the TS Letter to TradingScreen, but was eventually informed that State Street had prohibited TradingScreen from disclosing any information to Suite.

41.     Indeed, TradingScreen confirmed State Street's obstruction in the TS Action:

> On September 30, 2014, State Street's in-house counsel sent TradingScreen's counsel an email stating in relevant part that "we have considered your request internally with respect to sharing information with Suite, and we will not waive any prohibitions contained in [the agreement and SOW between State Street and Trading Screen]."  Upon information and belief, <u>evincing a want of scant care or an indifference to the rights of TradingScreen or a complete or reckless disregard of TradingScreen's rights and apparently intentionally trying to conceal its infringement of Suite's intellectual property rights</u>, State Street counsel further

> stated that "[a]s a kind reminder, TradingScreen has an obligation to continue to abide by certain terms under the Agreement, including, but not limited to, Section 10 of the Agreement" entitled "Confidential Information."

See Am. Compl., Ex. A at ¶ [] (emphasis added).

42.     Around this time, State Street delivered the Copyrighted Work to TradingScreen. Remarkably, State Street's representation that ALib was never provided to Frost and that TradingScreen could not use or distribute Suite's intellectual property to third-party customers of TradingScreen under the arrangement was patently false.  Indeed, as alleged in the TS Action:

> State Street knowingly breached the MDSA by providing to TradingScreen (through Frost & Fire) the risk calculation engine and related software containing confidential, proprietary intellectual property owned by Suite, without Suite's permission, which intellectual property TradingScreen required in order to perform its obligations under the MDSA and SOW and produce to State Street the promised deliverables, which under the SOW could also be used by other customers of TradingScreen.

See Am. Compl., Ex. A at ¶ 7 (emphasis added).

43.     State Street knew and intended that the Copyrighted Work, including the Source-Code, would be delivered to TradingScreen.  In fact, in connection with the termination of the TS/SS Agreement, State Street sent a letter to TradingScreen specifically stating as follows:

> In addition. for the avoidance of doubt, SSGM hereby reminds TradingScreen that it's [sic] use of or access to any Third Party Content (including Suite LLC's ALib product) will terminate on the effective termination date, and all copies must be returned to SSGM.

See Exhibit C to the TS Action Complaint, annexed hereto as Ex. D.

D.  Frost

44.     Frost is a competitor of Suite.  Indeed, according to its website, http://www.frost-fire.com, Frost is a "Risk Compliance Business."  Specifically, Frost describes itself as:

a provider of next-generation systems and solutions for managing derivatives and securities risk in real-time. Built by experience traders and risk professionals, the firm provides essential analytics and functionality for monitoring and optimizing complex portfolios. Its solutions service broker dealers, hedge funds, asset managers and CCPs. . . . In a new era of financial regulation and increased scrutiny, Frost + Fire is a powerful partner, enhancing the trading process, setting up robust risk management practices, structuring and monitoring limits, ensuring compliance with complex regulations while enabling financial firms to achieve optimum risk-return profiles for their portfolios.

45.     Although Suite had been advised by State Street's in-house counsel, Anne T Chou-Leung, that Frost never possessed the Copyrighted Work, upon information and belief, Bleron formed Frost, served as its CEO while he was still working at State Street and took the Copyrighted Work for Frost's use.  After Bleron ended his employment with State Street, he and other State Street employees (including Nachikita Das and Clifford Lewis) began working at Frost.

46.     As alleged in the TS Action, as a condition of the SS/TS Agreement, State Street required that TradingScreen use and pay Frost in connection with the portfolio and risk management software that TradingScreen would host.   Specifically, the SS/TS Agreement required State Street to deliver to TS risk calculation software, as well as the Copyrighted Work.

State Street had required that TradingScreen use a company called [Frost], which develops and provides customized computer software products and services for use in connection with portfolio and risk management and analysis, to assist TradingScreen in the development of additional items of functionality that State Street required to be delivered under the SOW. The development of such additional functionality under the SOW required, among other things, the provision by State Street to TradingScreen of a risk calculation engine and related software based on proprietary intellectual property owned by a third party software provider, Suite []. That risk calculation engine-related software had already been developed internally by a State Street team lead [sic] by Bleron Baraliu, a Managing Director of State Street, who had left

the employ of State Street to form Frost [] on or about the time that
the MDSA and SOW were entered into by the parties.

See Am. Compl., Ex. A at ¶ 4.

47.     Thus, contrary to State Street's representations, Frost was not only in possession
of the Copyrighted Work, but it also contumaciously distributed the Copyrighted Work to
TradingScreen.     Indeed, and upon information and belief, Bleron misappropriated the
Copyrighted Work, which he had access to at State Street, for the benefit of Frost and continues
to use such materials, and/or derivative works created through the use of such materials, in the
conduct of Frost's business.

48.     Additionally, upon information and belief, Frost could not conduct its business as
it does now without the unauthorized use of the Copyrighted Work.

49.     Moreover, Suite has no way to determine whether State Street and Currenex
engaged in other acts of infringement by reproducing and distributing the Copyrighted Work to
other third parties, but, given their conduct, it is certainly likely.

**AS AND FOR A FIRST CAUSE
OF ACTION FOR DIRECT COPYRIGHT INFRINGEMENT
AGAINST ALL DEFENDANTS**
(Under the Copyright Act, 17 U.S.C. § 501)

50.     Suite hereby repeats and realleges paragraphs 1 through 49 of the Complaint with
the same force and effect as if fully set forth herein.

51.     Defendants have committed copyright infringement in violation of 17 U.S.C. §
101 et seq.

52.     The Copyrighted Work is an original work and protectable expression under 17
U.S.C. § 102.

53.     Suite has duly registered copyright of the Copyrighted Work, Reg. No. TXu001910058, and has complied, in all respects, with the copyright laws of the United States of America.

54.     Suite is the owner of all rights, title and interest in and to the Copyrighted Work, including the exclusive right to, inter alia, reproduce, copy and distribute the Copyrighted Work and prepare derivative works based thereon.

55.     Frost, having full knowledge of the existence of Suite's copyrights, infringed Suite's copyrights by reproducing, selling, and distributing the Copyrighted Work as well as using Suite's Source-Code to create unauthorized derivative works.

56.     In addition, Currenex and State Street have exceeded the scope of the Agreement and unlawfully reproduced and distributed the Copyrighted Work in its identical form to third-parties.

57.     The similarity between the Copyrighted Work and Frost's Risk Management Product is not a mere coincidence, nor can it be the product of Frost's independent creation. Moreover, as set forth in the TS Action, Frost reproduced and distributed the Copyrighted Work itself to TradingScreen.   Accordingly, there is no question that the copy distributed and reproduced by Frost, State Street and Currenex is substantially similar to the Copyrighted Work – indeed, they are identical.

58.     Defendants' copying of the Copyrighted Work was knowing and willful.

59.     Defendants' actions as described herein infringe upon the Copyrighted Work and violate Suite's exclusive rights under Section 106 of the Copyright Act, including but not limited to Suite's rights to copy and distribute its works and to prepare and distribute derivative works.

60.     Upon information and belief, Defendants' copyright infringement is continuing.

61.     By reason of Defendants' reproduction and distribution of the infringing Risk Management Product, Suite has sustained and will continue to sustain substantial injury, loss and damage to its ownership rights in its Copyrighted Work.  Indeed, State Street and Currenex have already unlawfully distributed and reproduced the Copyrighted Work and Suite has no way of knowing if State Street and Currenex sent the Copyrighted Work to other third parties.

62.     Defendants' conduct is without authorization, license or consent of Suite.

63.     As a direct and proximate result of Defendants' infringements of the Copyrighted Work and exclusive rights under copyright, Suite is entitled to damages and Defendants' profits pursuant to 17 U.S.C. § 504(b) for each infringement.

64.     Suite is at present unable to ascertain the full extent of the gains, profits and advantages Defendants have obtained by reason of its acts of copyright infringement, but Suite is informed and believes that Defendants have obtained such gains, profits and advantages in an amount exceeding $1,000,000 (US).

65.     Further irreparable harm to Suite is imminent as a result of Defendants' conduct and Suite is without an adequate remedy at law.  Pursuant to 17 U.S.C. § 502, Suite is entitled to an injunction restraining Defendants, their agents, employees, representatives and all persons acting on their behalf from engaging in further such acts of copyright infringement.

66.     Suite is entitled to its attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

**AS AND FOR A SECOND CAUSE**
**OF ACTION FOR CONTRIBUTRY COPYRIGHT INFRINGEMENT**
**AGAINST STATE STREET AND CURRENEX**
(Under the Copyright Act, 17 U.S.C. § 501)

67.     Suite repeats and realleges paragraphs 1 through 66 of this complaint as if fully set forth herein.

68.     As set forth above, State Street and Currenex not only committed direct infringement by providing the Copyrighted Work to Frost, but they also had knowledge (or were willfully blind to the fact) that Frost would then directly infringe Suite's copyrights by reproducing and copying the Copyrighted Work and creating derivative works using the Copyrighted Work for its competitive risk compliance business.

69.     In addition, State Street induced, caused and materially contributed to the direct infringing conduct of Frost by requiring that TradingScreen pay Frost to provide the copy of the Copyrighted Work despite knowing that the Copyrighted Work belonged to Suite and that Frost did not have authorization, license or consent for its actions with respect to the Copyrighted Work.

70.     Indeed, in the TS Action, TradingScreen alleged that State Street required "that TradingScreen use a company called [Frost], which develops and provides customized computer software products and services for use in connection with portfolio and risk management and analysis . . . [t]he development of such additional functionality under the SOW required, among other things, the provision by State Street to TradingScreen of a risk calculation engine and related software based on proprietary intellectual property owned by a third party software provider, Suite []."

71.     State Street has not acted reasonably or in good faith in response to Suite's requests for information and concerns about Frost's repeated and continued infringement of the Copyrighted Work.

72.     State Street's acts of contributory infringement have been willful, intentional, and purposeful, in disregard of and with indifference to Suite's rights.

73.     As a direct and proximate result of State Street's contributory infringement of the Copyrighted Work, Suite is entitled to damages and State Street's profits pursuant to 17 U.S.C. § 504(b) for each infringement.

74.     Suite is entitled to their attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

75.     State Street's conduct is causing and, unless enjoined and restrained by this Court, will continue to cause Suite great and irreparable injury that cannot fully be compensated or measured.  Suite has no adequate remedy at law.

76.     Pursuant to 17 U.S.C. § 502, Suite is entitled to injunctive relief prohibiting further contributory infringements of Suite's Copyrighted Work.

**AS AND FOR A THIRD CAUSE OF ACTION**
**FOR VICARIOUS COPYRIGHT INFRINGEMENT**
**AGAINST STATE STREET AND CURRENEX**
(Under the Copyright Act, 17 U.S.C. § 501)

77.     Suite repeats and realleges paragraphs 1 through 76 of this complaint as if fully set forth herein.

78.     As set forth above, State Street and Currenex not only committed direct infringement by providing the Copyrighted Work to Frost, but they also possessed the right and ability to supervise, stop or limit the infringing activity of their former managing director, Bleron.   They also possessed an obvious and direct financial interest in the exploited Copyrighted Work.

79.     Indeed, they required that TradingScreen pay Frost to provide a copy of the Copyrighted Work that TradingScreen needed in order to comply with its obligations to State Street.  As a direct and proximate result of State Street's failure to supervise and control Bleron and Frost, Frost has, upon information and belief repeatedly infringed and will continue to repeatedly infringe Suite's Copyrighted Work.

80.     Indeed, in the TS Action, TradingScreen alleged that State Street required "that TradingScreen use a company called [Frost], which develops and provides customized computer software products and services for use in connection with portfolio and risk management and analysis . . . [t]he development of such additional functionality under the SOW required, among other things, the provision by State Street to TradingScreen of a risk calculation engine and related software based on proprietary intellectual property owned by a third party software provider, Suite []."

81.     State Street has not acted reasonably or in good faith in response to Suite's requests for information and concerns about Frost's repeated and continued infringement of the Copyrighted Work.  Nor has State Street provided adequate – or any assurances – that the direct infringement by Frost would cease.

82.     State Street's acts of vicarious infringement have been willful, intentional, and purposeful, in disregard of and indifference to Suite's rights.

83.     As a direct and proximate result of State Street's vicarious infringement of the Copyrighted Work, Suite is entitled to damages and State Street's profits pursuant to 17 U.S.C. § 504(b) for each infringement.

84.     Suite is entitled to its attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

85.     State Street's conduct is causing and, unless enjoined and restrained by this Court, will continue to cause Suite great and irreparable injury that cannot fully be compensated or measured.

86.     Suite has no adequate remedy at law.

Pursuant to 17 U.S.C. § 502, Suite is entitled to injunctive relief prohibiting further contributory infringement of Suite's Copyrighted Work.

**AS AND FOR A FOURTH CAUSE**
**OF ACTION FOR BREACH OF CONTRACT**
**AGAINST CURRENEX AND STATE STREET**

87.    Suite repeats and realleges paragraphs 1 through 86 of this complaint as if fully set forth herein.

88.    The Agreement is a valid, binding and enforceable agreement between Suite and Currenex.

89.    Suite has performed its obligations under the Agreement and has provided Currenex and State Street with a license to use the Copyrighted Work under the Agreement.

90.    As described above, Currenex and State Street have breached the Agreement by disclosing the Software Components, which is defined in the Agreement as "confidential information" to third parties, including an existing customer of Suite (TradingScreen) and a competitor of Suite (Frost).

91.    Currenex and State Street have also breached the Agreement by violating certain restrictions in the Agreement, i.e., the prohibition on "otherwise mak[ing] available to any third-parties direct access to the analytic library functions (program interfaces) in a way that competes with Suite's licensing to other parties of direct access to Suite's ALib analytic library functions (program interfaces)."  Not only did State Street and Currenex violate this restriction when they sent the Copyrighted Work to a current customer of TradingScreen, but more egregiously, Currenex and State Street provided Suite's Copyrighted Work to a direct competitor of Suite.

92.    Currenex and State Street's breaches of the Agreement are material.

93.    By reason of the foregoing, Suite has been damaged in an amount to be determined at trial, but in no event less than the amount of $1,000,000 (US) with interest thereon, together with costs and attorneys' fees.

## AS AND FOR A FIFTH CAUSE OF ACTION
## FOR MISSAPROPRIATION OF TRADE SECRETS
## <u>AS AGAINST ALL DEFENDANTS</u>

94.     Suite repeats and realleges paragraphs 1 through 93 of this complaint as if fully set forth herein.

95.     As described above, the Copyrighted Work comprise protected trade secrets as it is a compilation of confidential information used by Suite that gives it an opportunity to obtain an advantage over competitors who do not know or use it.

96.     The Copyrighted Work is not generally known outside of Suite, it would be extremely difficult for another party to create or duplicate the Copyrighted Work and it would be very valuable to a competitor like Frost.

97.     Further, Suite invests significant money, time and effort developing and maintaining the Copyrighted Work and Suite takes extensive steps to maintain the secrecy over the Copyrighted Work, including by inserting restrictions and confidentiality obligations in the Agreement with State Street and Currenex

98.     State Street and Currenex breached the Agreement, misused the Copyrighted Work and have misappropriated Suite's trade secrets by (i) allowing their former employee, Bleron, to take the Copyrighted Work to a competitor he founded and (ii) materially inducing him to further misappropriate the Copyrighted Work by providing it to TradingScreen (and perhaps others).

99.     As to Frost, Bleron improperly took Suite's trade secrets from State Street while he was employed there and used it at his competitive business, Frost.

100.    Upon information and belief, Defendants' misappropriation of Suite's trade secrets in ongoing.

101.   Defendants' conduct is without the authorization, license or consent of Suite.

102.   As a direct and proximate cause of the misappropriation of Suite's trade secret, Suite has been damaged in an amount to be determined at trial, but in no event less than the amount of $1,000,000 (US) with interest thereon, together with costs and attorneys' fees.

103.   Defendants' intentional and willful actions in connection with their misappropriation of Suite's trade secrets and further efforts to conceal their efforts should be punished to deter future egregious conduct by them and others.  Accordingly, Suite seeks punitive damages in an amount to be determined at trial, but in no event less than $3,000,000 (US).

**AS AND FOR A SIXTH CAUSE OF ACTION
FOR UNJUST ENRICHMENT AS AGAINST FROST**

104.   Suite repeats and realleges paragraphs 1 through 103 of this complaint as if fully set forth herein.

105.   As described above, Bleron received access to the Copyrighted Work while he was employed at State Street.  Indeed, he was involved in negotiating the Agreement directly with Suite.

106.   Bleron then took the Copyrighted Work to Frost, a competitor to Suite.

107.   Frost never licensed the Copyrighted Work and Suite received no remuneration from Frost for its use of the Copyrighted Work.

108.   Frost has been paid $400,000 for providing the Copyrighted Work to TradingScreen.  In addition, upon information and belief Frost continues to use the Copyrighted Work in connection with its business.

109.   By reason of the foregoing, Frost was unjustly enriched at Suite's expense and it would be against equity and good conscience to permit Frost to retain the benefit it has received.

110.     Accordingly, Suite seeks to recover an amount to be determined at trial, but in no event less than the amount of $400,000 (US) with interest thereon, together with costs and attorneys' fees.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs pray for judgment against Defendants as follows:

a.     For entry of judgment against Defendants for all damages to which Suite may be entitled, including Defendants' profits and for punitive damages in an amount as may be proven at trial;

b.     For a permanent injunction enjoining Defendants and their respective officers, agents, servants, employees, attorneys, successors, licensees, partners, and assigns, and all persons acting in concert or participation with each or any of them, from (a) directly or indirectly infringing in any manner any of Suite's copyrights or other exclusive rights (whether now in existence or hereafter created), including without limitation, copyrights or exclusive rights under copyright in the Copyrighted Work, and (b) causing, contributing to, enabling, facilitating, or participating in the infringement of any of Suite's copyrights or other exclusive rights (whether now in existence or hereafter created), including without limitation, copyrights or exclusive rights under copyright in the Copyrighted Work;

c.     For prejudgment and post-judgment interest according to law;

d.     For Suite's attorneys' fees, and full costs and disbursements in this action; and

e.     For such other and further relief as the Court may deem proper and just.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Suite demands trial by jury of all

issues triable by right of jury.

Dated:  New York, New York                    ROBINSON BROG LEINWAND GREENE
       September 12, 2017                      GENOVESE & GLUCK P.C.

                                By:  /s/ Justin E. Klein
                                   Justin E. Klein, Esq.
                                   Nicholas M. Menasché, Esq.

                             875 Third Avenue, 9th Floor
                             New York, New York  10022
                             Telephone: (212) 603-6300
                             Facsimile:  (212) 956-2164

                             *Attorneys for Plaintiff Suite, LLC*